[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION RE PLAINTIFF'S MOTION FOR CONTEMPT OR TO COMPEL
The plaintiff has filed this post-judgment action seeking to enforce the 1990 judgment dissolving the parties' twenty-six year marriage. The plaintiff asks the court either to hold the defendant in contempt for not complying with the terms of the property settlement incorporated in the court's judgment or, in the alternative, to enter court orders now enforcing those terms. The defendant acknowledges that he has not honored certain terms of the judgment. He argues, however, that the parties later agreed to modify those terms and claims the defenses of waiver, laches, and equitable estoppel against now enforcing the original terms. For the reasons set forth below, the court grants the plaintiff's motion in major part. Part I of this opinion states the applicable background necessary for considering the issues at hand. Part II discusses the court's findings of fact and Part III the court's conclusions on the legal claims raised by the parties. Part IV applies the factual findings and legal conclusions to the issues presented here.
 I
On April 5, 1990, the court, Dranginis, J., entered judgment dissolving the marriage of the parties. The court adopted and incorporated into the terms of the judgment a written property settlement signed that same day by the parties and their attorneys. Its principal purpose was to "transfer and pay to the Plaintiff as a division of the property owned by the parties and not as alimony the sum of $600,000." Separate sections of paragraph one of the property settlement described the five terms under which the defendant would pay the plaintiff that amount:
 • Paragraph 1a stated that the defendant would pay the plaintiff $150,000 upon sale of the parties' jointly owned marital home at 200 Candlewood Lake Road in New Milford. The CT Page 1721 judgment provided that the plaintiff would live there until its sale, and that the defendant would pay mortgage, real property taxes, and insurance for the premises.
 • Paragraph 1b stated that the plaintiff would receive $150,000 in pension and IRA rollovers.
 • Paragraph 1c said that $25,000 of the $600,000 was attributable to furnishings and personalty in the marital estate that became the sole property of the plaintiff.
 • Paragraph 1d guaranteed that the plaintiff would receive $50,000 upon the sale of the delicatessen business known as "Pat's Deli" and operated by the plaintiff. The judgment explicitly stated that "the $50,000 figure is an agreed value of said business so that, if upon the sale of the same, the net exceeds the $50,000 the Defendant shall receive a credit against sums due the Plaintiff hereunder and should the net selling price of said property be less than $50,000 the Plaintiff shall be paid additional amounts by the Defendant as adjustments so that she receives $50,000 attributable to this asset. It is understood that this asset is a going business currently being operated by the Plaintiff and is presently on the market for sale. The Plaintiff agrees she will maintain said business as a going business until the sale thereof. . . ."
 • Paragraph 1e stated that "[t]he balance of $225,000 shall be paid . . . pursuant to the Promissory Note and Security Agreement hereto annexed, said sum to be paid in monthly installments commencing one month from date at 9% interest over a period of 13 years and to be secured by the pledge of securities as collateral as more particularly set forth in said promissory note."
The parties do not dispute that the defendant complied with the terms of paragraphs 1b and 1c above. Their quarrel here arises from two written post-judgment agreements signed by the parties in February 1991 and June 1993 and from an oral agreement in April 1991 that all purported to modify the terms of paragraphs 1a and 1e. They also disagree about the enforcement of paragraph 1d.
The terms of the written 1991 and 1993 agreements are set forth in the findings of fact in Section II below. Under those two CT Page 1722 written agreements, the parties agreed that:
 • The plaintiff would leave and the defendant would then reoccupy the marital home;
 • The defendant would pay the plaintiff $103,000 for her to buy a condominium to live in as an advance on his obligation to pay the $225,000 due under paragraph 1e of the property settlement;
 • The plaintiff would receive her share from the sale of the house by June 1995; and
 • The defendant would obtain only $75,000 from sale of the house instead of $150,000.
The written agreements do not stand alone, however. The defendant claims that the parties also orally agreed that he could take the house off the market and eliminate some of the interest due to the plaintiff under paragraph 1e of the property settlement. He also claims that after 1993 he was no longer required to pay the plaintiff her share of the house's value by June 1995. The plaintiff asserts that she made any such agreements to help the defendant and only because the defendant promised that he would always take care of her financially.
The parties also disagree about the circumstances surrounding each agreement and the legal effect of those agreements. The plaintiff depicts the 1991 agreement as a favor to the defendant, who, she testified, "was in a kind of mental tailspin." According to the plaintiff, the defendant called her, was crying and upset, and said he could not continue living at the Torrington condominium the parties owned because it was too small and noisy. She testified that she then proposed the idea of moving out if he would pay her $100,000 to purchase her own condominium to live in. The defendant, on the other hand, testified that the 1991 transaction was solely ex-wife's idea and denied that he had been emotionally upset or suicidal at the time. He testified that she told him she could not stand living in the house because it was too much for her to keep up and that she wanted to move into something smaller and more manageable.
Before the 1991 agreement, the defendant had been paying the plaintiff $2,452 a month as his payment under paragraph 1e of the property settlement. He testified that he told the plaintiff CT Page 1723 he could no longer afford $2,452 each month because those payments had relied on income from the assets he had to sell to pay her the $103,000. The defendant drafted a new amortization schedule, under which he would no longer pay nine percent annually on all unpaid balances. Instead, the new schedule he drafted combined the principal he still owed after his $103,000 payment together with all interest he would from have paid from then on at nine percent annual interest had he maintained regular monthly payments of $2,452. The sum of those two amounts was $144,000, which the defendant testified that both parties agreed would satisfy his obligations under paragraph 1e. Between 1991 and 1999, he paid that amount to the plaintiff in varying monthly amounts between $500 and $1,500 and now claims to have fulfilled his obligations under that term of the judgment, an assertion the plaintiff disputes.
The defendant acknowledges that the 1993 agreement was drawn up for his benefit. He testified that he found himself unable to satisfy all his financial obligations and feared losing some or all of his real properties. He testified that he called his ex-wife and told her about his financial situation and that the only way he could preserve his properties upon which she was a co-obligor was to refinance them and for her to reduce the amount of money due to her on the eventual sale of the house from $150,000 to $75,000. He also told her that he needed her to release her mortgages as part of that refinancing. He testified that they met at a New Milford diner, where he explained to her that since he had been unable to sell the property for their original asking price, they must have valued it incorrectly at the time of the dissolution, and that what he referred to as this "inequity" justified reducing the value she would receive upon sale of the house.
The plaintiff, on the other hand, portrays the making of the 1993 agreement similarly to how she described what happened in 1991. She testified when they met at the New Milford diner, he was again crying, saying he was desperate. He told her about his finances, the decline in the market value of the real estate, and said that he needed her help. She said she agreed to do so after he again promised "he would always take care of me."
Both parties admit that the plaintiff made no formal written demand upon the defendant for compliance with the original terms of the court's 1990 judgment until just before the commencement of this action in 1998. As a result, the defendant claims the CT Page 1724 defenses of waiver, laches, and equitable estoppel.
 II
In considering the plaintiff's claims and the defendant's defenses here, this court must evaluate and resolve the various factual issues that arise from the parties' differing testimony about the events of the last nine years. Accordingly, the court makes the following findings of fact that the court finds relevant and necessary to resolving the issues presented here:
 #1. During the marriage between the parties, the defendant made the financial decisions for the parties although he would consult with and advise his wife before carrying out those decisions. The defendant has much greater financial awareness and acumen than the plaintiff, who relied on his advice. It was the plaintiff's practice, both during the marriage and afterwards, to accede readily to his recommendations.
 #2. The defendant is an attorney admitted to the practice of law in Connecticut and New York. The plaintiff's highest educational level is a G.E.D. certificate.
 #3. In February 1991 the parties entered into a written agreement to modify the property settlement. This written agreement is contained in Defendant's Exhibit 1, a letter signed by both parties and addressed to both counsel. The defendant drafted that letter and then reviewed its terms with the plaintiff, who agreed to it. The plaintiff sought the assistance of her trial counsel in carrying out the agreement. The terms of that agreement are as follows:
 i. The parties agreed that the plaintiff would move out of the marital residence and that the defendant would move back into it.[1] The court finds the testimony of the plaintiff that the defendant told her he was unhappy living in the condominium to be credible. Similarly the court finds equally credible the testimony of the defendant that the plaintiff told him the marital home was too large for her to maintain and that she wanted to leave it and purchase a condominium she could move into. CT Page 1725
 ii. The defendant would pay the $150,000 due to the plaintiff under paragraph 1a either upon sale of the house or, if the house were not sold by June 1995, with cash from the proceeds from a refinancing.[2]
 iii. The parties agreed that, to enable the plaintiff to purchase a condominium she could move into, the defendant would pay the plaintiff $103,000 as a partial prepayment of the $225,000 he owed her under paragraph 1e of the judgment. After payment of that $103,000, coupled with payments the defendant had already made on that note, the defendant owed a balance of $116,268 to the plaintiff on that obligation.
 iv. In connection with and to carry out the agreement in Exhibit 1, the defendant signed a promissory note dated February 21, 1991 that stated that it "constitute[d] a substitution and modification of the original mortgage note between the parties in the amount of $150,000 dated October 30, 1990."
 #4. The agreement the parties made in Exhibit 1 was to their mutual benefit.
 #5. After both parties signed Defendant's Exhibit 1, the provision of paragraph 1e of the original Stipulation that the defendant would pay interest of nine percent on unpaid balances due under the paragraph remained fully in effect and binding on the defendant.
The 1991 agreement, although drafted by the defendant, contains no language agreeing to waive continuing accrual of interest. The court believes it appropriate to construe the terms of this agreement strictly against the defendant for several reasons. If there had then been an actual agreement to waive such interest, the defendant, as drafter of the agreement, could and would have included such an agreement in Exhibit 1, the document he drafted memorializing that agreement. As author of the agreement, he had ample opportunity to include all terms favorable to himself in the letter.
The defendant testified that Exhibit 1 "accurately reflect[ed] the discussion he had with her." He was an attorney admitted to CT Page 1726 the practice of law in Connecticut and New York. The plaintiff's highest educational degree is a G.E.D. certificate. Thus, the court finds the omission of any waiver in the 1991 agreement of continuing accrual of interest to be significant.
 #6. In April 1991, the defendant told the plaintiff that he could no longer afford to keep paying $2,452 per month on this debt. He told her that his payment of the $103,000 was going to affect how much interest she would receive from him under paragraph 1e of the judgment. Because the defendant assured the plaintiff that he would always take care of her financially and never let her become destitute, the plaintiff said she didn't "care about the interest" and that he should just "[f]igure out how much [he] would owe and pay [her] that amount." He told her he would convert the debt he owed her under paragraph 1e to a fixed amount of $144,000, which consisted of the sum of the principal due after the $103,000 payment plus interest that would have accrued if the plaintiff had repaid his current balance at the original payment rate of $2,452 per month at nine percent annual interest. The plaintiff did not complain about what the defendant was proposing regarding repayment of the obligation under paragraph 1e because he promised her that he would "always take care of her" financially. The court finds the plaintiff's testimony set forth in the margin[3] to be credible.
 #7. The court finds that the plaintiff knowingly, intentionally, and voluntarily relinquished and waived her right to remain in the marital estate.
 #8. In September 1991, after he moved back into the Candlewood Lake house, the defendant took if off the market for sale. Both parties had believed, at the time of the divorce, that the property would be sold soon afterwards at or close to their agreed-upon asking price. The defendant had not received any offers to purchase the property at the sales price the parties had agreed to in the Judgment.
 #9. Under the dissolution judgment, the defendant was responsible for repairs, maintenance, mortgage payments, taxes, and property insurance for the Candlewood Lake premises. After he moved back in, the defendant spent CT Page 1727 approximately $20,000 for needed repairs but the plaintiff was not responsible for any of these damages.
 #10. The 1993 agreement between the parties, which is documented in Defendant's Exhibit 10, was made at the request of and for the sole financial benefit of the defendant. It enabled him to protect real property he owned from foreclosure, reduced his overall indebtedness both to his mortgage lenders and to his ex-wife, and increased his financial flexibility in the future by removing the plaintiff's mortgages from some of that real property. The plaintiff received no financial benefit from this agreement.
 #11. The plaintiff was unrepresented in the 1993 agreement. The defendant never advised her to get independent counsel. He falsely informed her that she needed to release her mortgages in order for him to obtain the refinancing of his real property that he sought, and never told her that she could instead merely subordinate her mortgages to any new mortgages. The defendant's testimony that he believed Attorney Fred Baker, who had represented both parties in the past but was only representing him and not the plaintiff in this transaction, would protect the plaintiff's interests in the 1993 transaction is not credible. As an attorney himself, the defendant knew that Baker's ethical obligation to him would require Baker to pursue the defendant's best interests, even to the detriment of the best interests of the plaintiff.
 #12. The plaintiff signed the 1993 agreement that reduced the amount the defendant would pay her upon sale of the house from $150,000 to $75,000 based on the defendant's promise to her that he would always take care of her financially.
The plaintiff testified that she agreed to reduce the mortgage from $150,000 to $75,000 "after he promised he would always take care of me." The defendant admits making such statements before 1993 but, significantly, does not deny having said so in 1993. His response to a question on cross-examination about whether he remembered making such representations to her was one that the court regards as equivocal:
 THE DEFENDANT: "I made them prior to 1993. I said I don't CT Page 1728 recall that being part of the conversation in 1993."
 MR. LEVY: "All right. So if she testified that you said it, you would have no way of refuting that?"
THE DEFENDANT: "That is correct."
The court thus believes the plaintiff's testimony that the defendant promised, in conjunction with the 1991 and 1993 agreements, that he would always take care of the plaintiff financially and not let her become destitute and that she entered into those agreements because he made that promise. The defendant's own testimony supports the court's decision to do so. The court also finds that she would not have entered into any of the post-judgment agreements if the defendant had not made such a promise.
 #13. On July 14, 1993, the defendant signed an "Amendment to Mortgage Note" that modified the original October 30, 1990 mortgage note on the marital home that he had signed as part of the original judgment. The July 14, 1993 Amendment stated that "for value received" the parties agreed to reduce the amount due on the October 30, 1990 note from $150,000 to $75,000.
 #14. Since 1993, the defendant has not lived up to his promises to take care of the plaintiff financially.
 #15. In 1991 the plaintiff sold Pat's Deli to Laura Parker for a purchase price of $41,500. She received $15,000 in cash and accepted an IOU from Parker in the form of a purchase money note for $26,500. Parker paid the plaintiff only $9,001 toward the principal balance of $26,500 before defaulting on the note. The plaintiff then agreed to release Parker from the note in exchange for taking back ownership of the Deli, which she later sold to Ray Underwood for $7,000. The plaintiff did not inform the defendant that Parker had defaulted on the purchase money note, that she took the business back, or that she later sold the deli business again for $7,000 until late 1997 just before the beginning of the current litigation. After the plaintiff demanded that the defendant fulfill his obligation under paragraph 1d, the defendant paid her $19,856.50. As a result of these various CT Page 1729 transactions, the plaintiff has received $9,399.28 less than the $50,000.
 #16. Paragraph 1d of the original judgment concerning defendant's obligation to ensure that the plaintiff netted $50,000 from the sale of the Deli had also obliged the plaintiff to maintain the deli as a going business. However, when the plaintiff sold the business to Underwood, it was no longer in operation.
 #17. The plaintiff's main financial concern, in 1991, in 1993, and in 1997 when she wrote the defendant and began making the demands that are the subject of this litigation, was that she not end up destitute. When she made the agreements with the defendant in 1991 and 1993, she did so because she relied on the defendant's promise to take care of her financially. The plaintiff would not have made these agreements unless the defendant had such a promise.
 #18. The defendant has not met his burden of establishing the factual prerequisite necessary for his defense of equitable estoppel that, in reliance on the 1991 and 1993 agreements, he changed his position to his detriment or "for the worse."
The sole evidence offered by the defendant to satisfy his burden occurred on cross-examination:
MR. LEVY "What did you do to your detriment . . . with regard to any of the transactions that occurred subsequent to your divorce."
THE DEFENDANT "I lost the interest on $100,000 when I liquidated those assets to give her the $100,000 advance. . . . I moved into the house and had to make the improvements, changes and repairs that were necessitated there. . . . I have structured my current family life and financial situation based on the agreements."
As the defendant agreed in further cross-examination, any interest he lost on the $100,000 partial prepayment was offset by the savings in interest payments on the obligation under paragraph 1e of the divorce judgment. Although he had to make CT Page 1730 improvements, changes and repairs to the house, he also agreed that doing so would have been his obligation anyway even if the plaintiff had stayed in the premises, and he admitted that he did not hold her responsible for causing any damage to the house. His mere conclusory statement that he has structured his "current family life and financial situation based on the agreements" does not establish that he has done so to his detriment. To the contrary, it appears to the court that these agreements have enabled him to structure his financial situation to his benefit. They allowed him, for example, to refinance the properties and reduce his overall mortgage indebtedness.
 III
The plaintiff has asked the court to find the defendant in contempt for his failure to comply with his obligations under paragraphs 1a, d and e of the divorce judgment, or, in the alternative, to enter orders enforcing those paragraphs. To the plaintiff's claim that these obligations are a non-modifiable property settlement, the defendant has interposed defenses of waiver, laches, and equitable estoppel
Under section 46b-81b of the General Statutes, a property settlement adopted by the court and incorporated into the terms of a judgment dissolving a marriage is nonmodifiable. Bunche v.Bunche, 180 Conn. 285, 287-288, 429 A.2d 874 (1980). The defendant claims, however, that this court should not find him in contempt for not complying with 1990 judgment because he claims that he did not intentionally violate the court's 1990 order. The defendant asserts that he has based his actions on good faith belief that the plaintiff and he had, in the 1991 and 1993 agreements, modified the terms of the dissolution judgment. SeeMarcil v. Marcil, 4 Conn. App. 403, 494 A.2d 620 (1985), where the court upheld a trial court's refusal to find a party in contempt under similar circumstances. While acknowledging that the 1991 judgment could not be modified, the defendant claims that three defenses prevent the court from enforcing that judgment — waiver, laches, and equitable estoppel.
"Waiver is the intentional abandonment of a known right. . . . Waiver is the voluntary relinquishment of a known right. It involves the idea of assent, and assent is an act of understanding. . . . Intention to relinquish must appear, but acts and conduct inconsistent with intention to [relinquish] . . . are sufficient." Southbridge Assoc. v.CT Page 1731Garofalo, 53 Conn. App. 11, 20, ___ A.2d ___ (1999).
The legal doctrines of laches and equitable estoppel are related concepts under which a court will not enforce a legal right under certain circumstances. Both doctrines require some sort of prejudice to the party asserting the doctrine, either because of inexcusable delay in asserting a claim or defense, or because he has changed his position "for the worse" in good reliance on conduct or statements of another. "Laches consists of two elements. First, there must have been a delay that was inexcusable, and, second, that delay must have prejudiced the defendant." Emerick v. Emerick, 28 Conn. App. 794, 803-804,613 A.2d 1351 (1992). "The mere lapse of time does not constitute laches . . . unless it results in prejudice to the defendant . . . as where, for example, the defendant is led to change his position with respect to the matter in question." Bozzi v. Bozzi,177 Conn. 232, 239, 413 A.2d 834 (1979).
Equitable estoppel, similarly, "is the effect of the voluntary conduct of a party whereby he is absolutely precluded, both at law and in equity, from asserting rights which might perhaps have otherwise existed, . . . as against another person, who has in good faith relied upon such conduct, and has been led thereby to change his position for the worse. . . . Its two essential elements are that one party must do or say something which is intended or calculated to induce another to believe in the existence of certain facts and to act on that belief, and that the other party, influenced thereby, must change his position or do some act to his injury which he otherwise would not have done." (Internal citations and quotation marks omitted.) Id., 802.
The defendant claims that the plaintiff has waived her right to enforce the original 1990 dissolution judgment because she agreed to the subsequent modifications and then inexcusably neglected to seek enforcement of the 1990 judgment until now, while he has in good faith modified his position to his detriment in reliance on those agreements. The essence of these claims is that the plaintiff's alleged "delay" in asserting violations of the judgment by the defendant was inexcusable, that the defendant relied in good faith on the 1991 and 1993 agreements, and that in consequence of each he has changed his position for the worse and to his prejudice.
The court will now apply those facts to the issues at hand. CT Page 1732
Payment on the $225,000 Note
Paragraph 1e of the judgment required the defendant to pay the plaintiff $225,000 over thirteen years at nine percent annual interest. The note signed by the parties memorializing this obligation permitted the defendant to make partial prepayment without any interest penalty. When the defendant advanced the defendant $103,000 in 1991, he thus had every right under the judgment to do so. The evidence establishes that the defendant told the plaintiff he would treat his obligation as a fixed dollar obligation, which he calculated as set forth above in the findings of fact. The evidence shows that the defendant accepted the plaintiff's plan only in reliance on his promise to take care of her financially forever. The defendant has paid off the amount that he refers to as his "fixed dollar" obligation.
The defendant has characterized the plaintiff's willingness to accept the defendant's plan for repaying his obligation under paragraph 1e as a contract that this court should regard as a waiver of her right to continued interest. The written 1991 agreement, contained in Exhibit 1, did not refer to any waiver of continuing accrual of interest on all unpaid balances. Any agreement to do so was oral, made two months later, and not incorporated in the written agreement the parties submitted to their attorneys. Without written terms, there is no definitive proof as to the terms of this oral agreement. The evidence is clear, however, that the plaintiff did not protest when the defendant told her about his revised payment plan after the defendant promised to take care of her financially always and in reliance on that promise.
The evidence also shows that when the plaintiff wrote the defendant three years later, in late 1997, she knew then that his payments on the paragraph 1e obligation would soon end. Such acquiescence in his revised payment plan, both in 1994 and 1997, are certainly consistent with her having waived the additional interest. Other evidence, such as the plaintiff's statements that she did not fully understand what the defendant was proposing, mitigate the other way. The court, however, need not decide whether these facts establish that the plaintiff actually agreed to the defendant's proposal to forego continuing accrual of interest because the court finds that any such agreement or waver is no longer binding and unenforceable now, for the reasons forth below. CT Page 1733
There are many issues regarding the continuing validity of any agreement to forego continuing accrual of interest as represented by the defendant's revised amortization schedule. Such an oral agreement between the parties could be characterized as an executory contract — an agreement by the plaintiff to waive continuing accrual of interest in exchange for the defendant's promise of future conduct, i.e., to take care of her financially. The plaintiff would not have made these statements or entered into such an agreement unless the defendant had made such a promise. The defendant's promise was thus an implied or constructive condition in a bilateral contract involving an exchange of promises in which the performance of each was a condition of the duty of the other to perform. The evidence shows that he has not fulfilled such a promise. The defendant's refusal to honor his promise is a material breach of the agreement and a repudiation of his promise. Accordingly, the plaintiff herself is entitled to terminate any contract between the parties to waive continuing accrual of interest. See, generally, E. Farnsworth, Contracts (1982), Chapter 8, Performance and Nonperformance, pp. 535-645.
Furthermore, as a court of equity this court will not enforce any agreement by the plaintiff to forego interest. Having failed to honor the promise that induced the plaintiff's willingness to waive additional interest and to accept his plan to repay a fixed dollar amount, the defendant comes to the court with unclean hands in seeking now to enforce her agreement. "One who seeks equity must also do equity and expect that equity will be done for all." Lacroix v. Lacroix, 189 Conn. 685, 689, 457 A.2d 1076
(1983). Although the defendant asserts that the plaintiff should be equitably estopped from enforcing the original agreement requiring continuing compounding of interest, it is the defendant himself who is estopped from enforcing any waiver by the plaintiff. He promised the plaintiff he would take care of her financially always. He should have known, from his twenty-six-year marriage to her, that the plaintiff would believe him. The plaintiff relied on that promise when she did not protest his proposal. Rules of law and basic fairness now require either that she can enforce his promise,[4] repudiate such an agreement, or at minimum prevent him from enforcing it.
The defendant has not established any "inexcusable delay" on the plaintiff's part in asserting her rights to the obligation due under Paragraph 1e. At the time she began this action, the CT Page 1734 defendant had not yet completed payments under his own "fixed dollar balance" version of what he owed. The original judgment did not specify how partial prepayment would affect the original monthly payment obligation of $2,452 or the thirteen-year length of the note. Any willingness on her part to accept payments of less than $2,452 per month, the amount originally agreed to by the parties at the time of the divorce, was certainly understandable considering the fact that the defendant paid a substantial part of this obligation as part of the 1991 agreement benefitting [benefiting] both parties. If the defendant maintained payments at the original rate of $2,452 per month he would have repaid the balance, after the $103,000 advance in 1991, in less time than if she accepted smaller monthly payments. Further, the defendant has not established that any delay by plaintiff in asserting her right to the full payment under paragraph 1e has caused him any prejudice or that he relied on the 1991 or 1993 agreements to his detriment. Accordingly the defenses of laches and equitable estoppel must fail as to this obligation.
Based on payments the defendant has made to date on the $225,000 obligation under paragraph 1e of the judgment, with annual interest of nine percent compounding on unpaid balance, the defendant still owes $50,621.62 to the plaintiff on that obligation, with additional interest accruing each month on the unpaid balance and interest accrued to date. An amortization schedule showing principal, payments, and application of payments toward principal and interest, is attached as an Appendix to this memorandum.
Payment of $150,000 upon sale of the marital home
The original 1990 judgment provided that the plaintiff would live in the marital home until it was sold. Under the 1991 agreement, the plaintiff agreed to leave the house, and the defendant agreed to pay the $150,000 due upon sale of the house or by June 1995, whichever occurred sooner. He also agreed that if the house had not been sold by then he would refinance the house so that he could satisfy this obligation. The 1993 agreement, however, sought to reduce the amount that the defendant would owe the plaintiff from sale of the house from $150,000 to $75,000. The defendant also claims that after the 1993 agreement, he believed he was no longer required to pay her that balance in June 1995. Since the plaintiff has not yet sold the house or transferred to the plaintiff either the $150,000 due under the original judgment or the $75,000 he claims as his CT Page 1735 reduced obligation pursuant to the 1993 agreement, the questions the court must consider are: What amount is due the plaintiff and when is (or was) it due?
As an effort to modify the property settlement contained in the 1990 judgment, the 1993 agreement is ineffective. Conceding that such a post-judgment agreement may not modify a property settlement, the defendant nonetheless seeks to resurrect the terms of the 1993 agreement by arguing that the plaintiff waived her right to any more than $75,000; that her delay in seeking either the $75,000 or $150,000 constitutes laches; and that she is now equitably estopped from making such claims now.
Waiver: The plaintiff waived her right in 1993 to the full $150,000 only because the defendant promised her that he would take care of her always and would not let her become destitute. He has not honored that promise since then. The 1993 agreement was in writing, and the court has no reason to believe that the plaintiff did not know what she was doing. The court adopts the same analysis here, however, that it applied above regarding waiver of continuing interest. The plaintiff agreed to modify the amount due upon sale of the house in exchange for the defendant's promise of future conduct, i.e., to take care of her financially. The plaintiff would not have made these statements or entered into such an agreement unless the defendant had made such a promise. That was the sole consideration for her doing so.[5]
The defendant's promise was an implied or constructive condition in a bilateral contract involving an exchange of promises where the performance of each was a condition of the duty of the other to perform. The defendant's refusal to honor his promise was a material breach of the agreement and a repudiation of his promise. Accordingly, the plaintiff herself is entitled to terminate any contract between the parties to forego the additional $75,000. See, generally, E. Farnsworth, Contracts (1982), Chapter 8, Performance and Nonperformance, pp. 535-645.
Furthermore, as a court of equity this court will not enforce any agreement by the plaintiff to do so. Having failed to honor the promise that induced the plaintiff's agreement, the defendant comes to the court with unclean hands in seeking now to enforce her agreement. "One who seeks equity must also do equity and expect that equity will be done for all." Lacroix v. Lacroix,189 Conn. 685, 689, 457 A.2d 1076 (1983). Although the defendant asserts that the plaintiff should be equitably estopped from seeking the remaining $75,000 now, the defendant himself is the CT Page 1736 one estopped. He promised the plaintiff he would take care of her financially always. He should have known that the plaintiff would believe him. The plaintiff relied on that promise when she agreed to accept less from sale of the house. Rules of law and basic fairness now require either that she can enforce his promise, cancel the agreement, or at minimum prevent him from enforcing it.
There is no evidence, furthermore, that the plaintiff ever agreed, in any manner, to wait indefinitely for this money or waived her right to payment by June 1995. The defendant testified that sometime in 1991 he had a discussion with the plaintiff telling her he was going to take the house off the market; he also said that he then still intended to pay her by June 1995. The defendant also testified that after the 1993 agreement and the various real estate refinancings that followed, he no longer believed he was required to pay off the balance of the note in 1995.
The 1993 agreement, however, does not refer to any change in the June 1995 due date. The defendant drafted this agreement, like the February 1991 agreement. Unlike the earlier occasion, however, the defendant did not this time advise the plaintiff to obtain her own attorney. Moreover, he procured her agreement to the 1993 agreement in part by misrepresenting the necessity for her assent to it. The plaintiff told the defendant that she needed to release various mortgages she held on properties he owned in order for him to get the refinancing he told her he needed. In fact, he could have obtained the refinancing if she had merely subordinated her mortgages to the newly refinanced mortgage. If he had advised her, as he did in 1991, to seek independent counsel, such an attorney would probably have advised her of this fact.
While the plaintiff might still have agreed to the defendant's request that she accept only $75,000 from the sale of the house, independent representation might also have obtained language for her in that agreement specifying terms for enforcing his promise to take care of her always. For that reason, plus all the reasons stated previously regarding the 1991 agreement, the court believes it appropriate to construe the terms of the 1993 agreement strictly against the defendant. Whatever the defendant may have believed following the 1993 agreement, nothing in it changed and the plaintiff nowhere waived his obligation to pay the plaintiff her financial share in the marital home by June CT Page 1737 1995. For reasons known only to the defendant, the 1993 agreement merely sought to modify the 1990 mortgage obligation that his note of February 21, 1991 promissory note had already attempted to supercede.
Laches and Equitable Estoppel: Under the 1991 agreement, the defendant was supposed to pay the $150,000 to the plaintiff by June of 1995. The plaintiff waited approximately three years after that to claim this amount. The court does not regard such a three-year wait, well within the six-year period of limitations for enforcing written contracts (which is how the defendant's attorney asserted in final argument this court should construe the 1991 and 1993 agreements), to demand this payment to be "inexcusable delay." The court also finds no prejudice or harm to the defendant necessary to satisfy the other elements of laches or equitable estoppel.
Based on the foregoing analysis, the court rejects the defenses of waiver, laches, and equitable estoppel concerning the plaintiff's claim for the full $150,000. Moreover, the court finds that this amount was due in June 1995. Under the terms of the 1991 agreement, which benefitted [benefited] both parties, part of the consideration for the plaintiff leaving the marital home was the defendant's promise to pay her the $150,000 by June of 1995. Having made this agreement and benefitted [benefited] from it, the defendant waived any right to prevent its enforcement.
Sale of the Deli
The parties have hotly disputed whether the defendant owes the plaintiff an additional $9,399.28. When informed by the plaintiff in late 1997 about the terms of the second deli sale, the defendant promptly paid the plaintiff all the shortfall between what she received for sale of the delicatessen and the $50,000 that the judgment guaranteed her from sale of the deli except $9,399.20. The point of contention between the parties is whether the plaintiff or the defendant should bear the financial brunt of the fact that the first purchaser defaulted on a purchase money note the plaintiff accepted in partial satisfaction of the first sale. The court does not believe it needs to reach this issue, however. The original judgment conditioned the defendant's guarantee on the plaintiff keeping the deli operating as a going business. The evidence established that at the time of the second sale, it was no longer in operation. Accordingly, the defendant is under no obligation to provide the remaining $9,399.28. CT Page 1738
 IV
The court therefore finds that the defendant has failed, without legal excuse, to comply with his obligations under the property settlement to:
• pay accruing interest on the $225,000 debt; and
 • pay the $150,000 due plaintiff from sale of the marital home or, as the parties modified the term of paragraph 1a, by June 1995.
The plaintiff has asked for a finding of contempt against the defendant. The defendant asserts that he did not comply with these terms of the original judgment, as modified (with regard to when the $150,000 was due) by the 1991 agreement, in good faith reliance on the 1991 and 1993 agreements. As the court held inMarcil v. Marcil, 4 Conn. App. 403, 405, 494 A.2d 620 (1985), "The fact that the order had not been complied with fully, however, does not dictate that a finding of contempt must enter. It is within the sound discretion of the court to deny a claim for contempt when there is an adequate factual basis to explain the failure to honor the courts order."
The court finds credible the defendant's testimony that he believed the plaintiff had assented to his plan to pay a fixed dollar balance. Although an attorney, he testified that he was not award that property settlements were non-modifiable, and the court also finds that testimony credible. The court thus declines to hold the defendant in contempt for his failure to abide by the terms of paragraph 1e of the property settlement.
The court also believes the defendant's testimony that he believed that the plaintiff had relinquished her right to more than $75,000. (As with the oral agreement that he could pay his debt under paragraph 1e as a fixed dollar amount, the plaintiff did agree to accept the reduced value from sale of the house.) The court does not find credible the defendant's testimony that after the 1993 agreement he could no longer afford to pay the defendant her cash share of the marital home by June 1995. Since the agreement to pay by 1995 was not a court judgment, however, the court does not, at this time, intend to find the plaintiff in contempt for failing to honor that agreement. CT Page 1739
The court intends to enter orders for enforcing its decision here. Such orders will specify the terms for the defendant to pay amounts still due under paragraph 1e and to pay the $150,000 that is the plaintiff's financial interest in the marital home. Before doing so, however, the court seeks the advice of the parties as to the specific orders the court should enter for implementing its decision herein. Further, the court seeks the views of the parties on the appropriateness of awarding interest under General Statutes section 37-3a with regard to either amount. The parties should submit any written proposals to the court on these two questions within thirty days of the date of the filing of this decision. Finally, the court invites the plaintiff to present evidence at a subsequent hearing on what she claims to be a reasonable attorneys fee for enforcing paragraphs 1a and 1e of the property settlement. The court has scheduled a hearing on these matters for Tuesday March 21, 2000 at 2:00 p. m..
SO ORDERED.
BY THE COURT
Stephen F. Frazzini, Judge of the Superior Court
 APPENDIX AMOUNT OF PAYMENT APPLIED TO DATE BALANCE PAYMENT INTEREST PRINCIPAL
May-91 $116,268.00 $1,000 $872.01 $127.99 Jun-91 $116,140.01 $1,000 $871.05 $128.95 Jul-91 $116,011.06 $1,000 $870.08 $129.92 Aug-91 $115,881.14 $1,000 $869.11 $130.89 Sep-91 $115,750.25 $1,000 $868.13 $131.87 Oct-91 $115,618.38 $1,000 $867.14 $132.86 Nov-91 $115,485.52 $1,000 $866.14 $133.86 Dec-91 $115,351.66 $2,000 $865.14 $1,134.86 Jan-92 $114,216.80 $1,000 $856.63 $143.37 Feb-92 $114,073.42 $1,000 $855.55 $144.45 Mar-92 $113,928.97 $1,300 $854.47 $445.53 Apr-92 $113,483.44 $1,300 $851.13 $448.87 May-92 $113,034.56 $1,300 $847.76 $452.24 Jun-92 $112,582.32 $1,300 $844.37 $455.63 Jul-92 $112,126.69 $1,300 $840.95 $459.05 Aug-92 $111,667.64 $1,300 $837.51 $462.49 CT Page 1740 Sep-92 $111,205.15 $1,300 $834.04 $465.96 Oct-92 $110,739.19 $1,300 $830.54 $469.46 Nov-92 $110,269.73 $1,300 $827.02 $472.98 Dec-92 $109,796.75 $1,300 $823.48 $476.52 Jan-93 $109,320.23 $1,300 $819.90 $480.10 Feb-93 $108,840.13 $1,300 $816.30 $483.70 Mar-93 $108,356.43 $1,300 $812.67 $487.33 Apr-93 $107,869.11 $1,300 $809.02 $490.98 May-93 $107,378.12 $1,300 $805.34 $494.66 Jun-93 $106,883.46 $1,300 $801.63 $498.37 Jul-93 $106,385.09 $1,300 $797.89 $502.11 Aug-93 $105,882.97 $1,300 $794.12 $505.88 Sep-93 $105,377.10 $1,300 $790.33 $509.67 Oct-93 $104,867.42 $1,300 $786.51 $513.49 Nov-93 $104,353.93 $1,300 $782.65 $517.35 Dec-93 $103,836.59 $1,300 $778.77 $521.23 Jan-94 $103,315.36 $1,300 $774.87 $525.13 Feb-94 $102,790.22 $1,300 $770.93 $529.07 Mar-94 $102,261.15 $1,300 $766.96 $533.04 Apr-94 $101,728.11 $1,300 $762.96 $537.04 May-94 $101,191.07 $1,300 $758.93 $541.07 Jun-94 $100,650.00 $1,300 $754.88 $545.12 Jul-94 $100,104.88 $1,300 $750.79 $549.21 Aug-94 $ 99,555.67 $1,300 $746.67 $553.33 Sep-94 $ 99,002.33 $1,300 $742.52 $557.48 Oct-94 $ 98,444.85 $1,300 $738.34 $561.66 Nov-94 $ 97,883.19 $1,300 $734.12 $565.88 Dec-94 $ 97,317.31 $1,300 $729.88 $570.12 Jan-95 $ 96,747.19 $1,300 $725.60 $574.40 Feb-95 $ 96,172.79 $1,300 $721.30 $578.70 Mar-95 $ 95,594.09 $1,300 $716.96 $583.04 Apr-95 $ 95,011.05 $1,300 $712.58 $587.42 May-95 $ 94,423.63 $1,300 $708.18 $591.82 Jun-95 $ 93,831.81 $1,300 $703.74 $596.26 Jul-95 $ 93,235.54 $1,300 $699.27 $600.73 Aug-95 $ 92,634.81 $1,300 $694.76 $605.24 Sep-95 $ 92,029.57 $1,300 $690.22 $609.78 Oct-95 $ 91,419.79 $1,300 $685.65 $614.35 Nov-95 $ 90,805.44 $1,300 $681.04 $618.96 Dec-95 $ 90,186.48 $1,300 $676.40 $623.60 Jan-96 $ 89,562.88 $1,300 $671.72 $628.28 Feb-96 $ 88,934.60 $1,300 $667.01 $632.99 Mar-96 $ 88,301.61 $1,300 $662.26 $637.74 Apr-96 $ 87,663.88 $1,300 $657.48 $642.52 May-96 $ 87,021.35 $1,300 $652.66 $647.34 CT Page 1741 Jun-96 $ 86,374.01 $1,300 $647.81 $652.19 Jul-96 $ 85,721.82 $1,300 $642.91 $657.09 Aug-96 $ 85,064.73 $1,300 $637.99 $662.01 Sep-96 $ 84,402.72 $1,300 $633.02 $666.98 Oct-96 $ 83,735.74 $1,300 $628.02 $671.98 Nov-96 $ 83,063.76 $1,300 $622.98 $677.02 Dec-96 $ 82,386.74 $1,300 $617.90 $682.10 Jan-97 $ 81,704.64 $1,300 $612.78 $687.22 Feb-97 $ 81,017.42 $1,300 $607.63 $692.37 Mar-97 $ 80,325.05 $1,500 $602.44 $897.56 Apr-97 $ 79,427.49 $1,500 $595.71 $904.29 May-97 $ 78,523.20 $1,500 $588.92 $911.08 Jun-97 $ 77,612.12 $1,500 $582.09 $917.91 Jul-97 $ 76,694.21 $1,500 $575.21 $924.79 Aug-97 $ 75,769.42 $1,500 $568.27 $931.73 Sep-97 $ 74,837.69 $1,500 $561.28 $938.72 Oct-97 $ 73,898.97 $1,500 $554.24 $945.76 Nov-97 $ 72,953.21 $1,500 $547.15 $952.85 Dec-97 $ 72,000.36 $1,500 $540.00 $960.00 Jan-98 $ 71,040.36 $1,500 $532.80 $967.20 Feb-98 $ 70,073.17 $1,500 $525.55 $974.45 Mar-98 $ 69,098.72 $1,500 $518.24 $981.76 Apr-98 $ 68,116.96 $1,500 $510.88 $989.12 May-98 $ 67,127.83 $1,500 $503.46 $996.54 Jun-98 $ 66,131.29 $1,500 $495.98 $1,004.02 Jul-98 $ 65,127.28 $1,500 $488.45 $1,011.55 Aug-98 $ 64,115.73 $1,500 $480.87 $1,019.13 Sep-98 $ 63,096.60 $1,500 $473.22 $1,026.78 Oct-98 $ 62,069.82 $1,500 $465.52 $1,034.48 Nov-98 $ 61,035.35 $1,500 $457.77 $1,042.23 Dec-98 $ 59,993.11 $1,500 $449.95 $1,050.05 Jan-99 $ 58,943.06 $1,500 $442.07 $1,057.93 Feb-99 $ 57,885.13 $1,500 $434.14 $1,065.86 Mar-99 $ 56,819.27 $1,500 $426.14 $1,073.86 Apr-99 $ 55,745.42 $1,500 $418.09 $1,081.91 May-99 $ 54,663.51 $1,500 $409.98 $1,090.02 Jun-99 $ 53,573.48 $1,500 $401.80 $1,098.20 Jul-99 $ 52,475.29 $1,500 $393.56 $1,106.44 Aug-99 $ 51,368.85 $1,500 $385.27 $1,114.73 Sep-99 $ 50,254.12 $1,500 $376.91 $1,123.09 Oct-99 $ 49,131.02 $368.48 Nov-99 $ 49,499.50 $371.25 Dec-99 $ 49,870.75 $374.03 Jan-00 $ 50,244.78 $376.84 Feb-00 $ 50,621.62 $379.66 CT Page 1742